UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAM PHAN NGUYEN,<br><br>                                   Plaintiff,<br><br>v.<br><br>ANDREW SAUL, Commissioner of Social Security,<br><br>                                   Defendant. | Case No.:  20-CV-2391-WVG<br><br>**ORDER ON JOINT MOTION FOR JUDICIAL REVIEW OF FINAL DECISION OF THE COMMISSIONER OF SOCIAL SECURITY:**<br><br>**(1) GRANTING IN PART;**<br>**(2) DENYING IN PART;**<br>**(3) REMANDING FOR FURTHER ADMINISTRATIVE PROCEEDINGS** |

This action arises from the Commissioner of Social Security Administration Kilolo Kijakazi's ("Commissioner" or "Defendant") denial of Phan Tam Nguyen's[1] ("Plaintiff") application for Social Security disability income benefits under Title II of the Social Security Act ("Act") and Supplemental Security Income ("SSI") benefits under Title XVI of the Act. On April 22, 2022, the Parties filed a Joint Motion for Judicial Review ("Joint

---

[1] For all previously filed documents, including the complaint, the caption indicated Plaintiff's name is "Tam Phan Nguyen." However, Plaintiff's state-issued driver's license indicates Plaintiff's name is "Phan Tam Nguyen." (Administrative Record 1101.)

Motion") pursuant to the Court's April 21, 2022 Order Following an Order to Show Cause Conference. (Doc. No. 28.) For the reasons below, the Joint Motion for Judicial Review is GRANTED IN PART, DENIED IN PART, and REMANDED for further administrative proceedings.

## I. <u>PROCEDURAL HISTORY</u>

On October 11, 2013, Plaintiff filed an application for disability income benefits and SSI benefits under Titles II and VI of the Act, alleging a disability onset date of June 1, 2011. (Administrative Record "AR" 182–86.) On February 6, 2014, the Commissioner initially denied both claims. (AR 46–63.) On April 7, 2014, Plaintiff requested reconsideration of the initial determination. (AR 124–25.) On June 25, 2014, the Commissioner denied reconsideration. (AR 66–95.) On July 29, 2014, Plaintiff requested a hearing by an administrative law judge ("ALJ"). (AR 134–35.) On January 4, 2016, ALJ Jay E. Levine ("ALJ Levine") conducted an oral hearing on Plaintiff's application. (AR 14-43.) On April 1, 2016, ALJ Levine issued a written decision, finding Plaintiff was not disabled under the Act. (AR 96–113.) On April 7, 2016, Plaintiff filed a request for review of ALJ Levine's decision (AR 176–81). On May 12, 2017, the Social Security Appeals Council ("Appeals Council") denied Plaintiff's request for review and thus finalized the Commissioner's ultimate decision. (AR 1–3.)

On July 12, 2017, Plaintiff filed a complaint in United States District Court for the Southern District of California appealing ALJ Levine's decision. (AR 748.) On July 31, 2017, Plaintiff filed a subsequent claim for SSI benefits. (AR 923–44.) The Appeals Council consolidated all claims after determining the subsequent claim was duplicative. (AR 696.) On October 20, 2017, the Commissioner again denied the claim for disability benefits. (AR 827.)

On August 3, 2018, Magistrate Judge Nita L. Stormes issued a Report and Recommendation on ALJ Levine's decision. (AR 752-792, "August 3, 2018 Report and Recommendation".) As to Plaintiff's physical impairments, Judge Stormes found substantial evidence supported ALJ Levine's finding of non-disability. (AR 790; *Nguyen*

*v. Berryhill*, 2018 WL 3706860, at 21 (S.D. Cal. Aug. 3, 2018).) As to Plaintiff's mental impairments, Judge Stormes determined ALJ failed to consider the entire record and provide "specific and legitimate reasons supported by substantial evidence" in rejecting the medical opinions and objective medical evidence of Plaintiff's mental impairments. (AR 790; *Nguyen*, 2018 WL 3706860, at *21.) Accordingly, Judge Stormes recommended ALJ Levine's decision regarding Plaintiff's mental health impairments be remanded and remedied. (AR 791; *Nguyen*, 2018 WL 3706860, at *21.) On September 5, 2018, United States District Judge Michael M. Anello adopted Judge Stormes' Report and Recommendation in its entirety. (AR 750; *Nguyen v. Berryhill*, 2018 WL 4214478 (S.D. Cal. Sept. 5, 2018).)

On February 26, 2019, the Appeals Council issued a notice remanding the case to the ALJ. (AR 793.) On July 20, 2020, ALJ Levine held a telephonic hearing with Plaintiff. (AR 722.) On September 1, 2020, ALJ Levine issued a written decision, finding Plaintiff not disabled as defined in the Act. (AR 693–710.) On December 8, 2020, Plaintiff commenced this action in the United States District Court for the Southern District of California. (Doc. No. 1.)

## II.   FACTUAL BACKGROUND

### a.  Plaintiff's Medical History

Plaintiff is 50 years old and alleges physical and mental impairments have left him disabled and unable to work since June 1, 2011. (AR 182–92.) Plaintiff contends he has not performed any gainful activity since the alleged onset of his disability. (AR 101.) Prior to the alleged disabling conditions, Plaintiff worked as a delivery worker and a manicurist. (AR 220.)

Plaintiff contends his physical impairments include suffering from Hashimoto's thyroiditis and related symptoms including hand tremors, heart palpitations, fatigue, and vision impairment. (*See, e.g.*, AR 28, 38, 314, 1023.) From 2011 to 2017, Plaintiff received treatment for his physical ailments including prescription medication and radioactive iodine therapy. (*See, e.g.*, AR 363, 401, 509, 1123.)

Plaintiff contends his psychological impairments include suffering from bipolar disorder, major depressive disorder, anxiety, and psychosis. (AR 699–708.) From 2011 to 2019, Plaintiff received treatment for his mental health issues including prescription medication and talk therapy. (*See, e.g.*, AR 317, 382, 396, 431, 490, 690, 1105, 1172, 1113.) After a series of failed medication treatments (*see, e.g.*, AR 394, 438), the most recent medication revealed success in controlling psychotic symptoms. (AR 1111–20.)

### b. Physical Health Evaluation and Treatment

#### 1. Evaluation and Treatment by Drs. Tran, Buono, and Kikkawa in 2011

On June 8, 2011, Plaintiff began treatment with primary care physician Ton D. Tan, M.D. ("Dr. Tan"). (AR 308.) Dr. Tran treated Plaintiff for weight loss, fatigue, and tremors in both of Plaintiff's hands. (AR 314.) Dr. Tran also diagnosed Plaintiff with hyperthyroidism (*id.*) and ordered a thyroid ultrasound due to a probable nodular goiter. (AR 308).

On November 11, 2011, Plaintiff went to the University of California, San Diego Health Services Emergency Department ("UCSD Health") for issues related to hyperthyroidism. (AR 317, 325.) Emergency physician Colleen J. Buono, M.D., ("Dr. Buono") treated Plaintiff and noted Plaintiff presented with Graves' disease and eye pain. (*Id.*) She noted a statement by the Plaintiff indicating Plaintiff's eyes felt like they were "coming out." (*Id.*) Dr. Buono referred Plaintiff to Shiley Eye Center for further treatment related to Plaintiff's eyes. (AR 327.)

On November 29, 2011, ophthalmologist Don O. Kikkawa, M.D., ("Dr. Kikkawa") evaluated Plaintiff at Shiley Eye Center. (AR 354.) Dr. Kikkawa diagnosed Plaintiff with bilateral exophthalmos and recommended Plaintiff get surgical treatment after Plaintiff was evaluated by an endocrinologist. (*Id.*)

#### 2. Evaluation and Treatment by Drs. Marquardt, Argoud, and Aiken from 2011–2015

On December 5, 2011, internist Diana L. Marquardt, M.D., ("Dr. Marquardt") evaluated Plaintiff and began treatment. (AR 401.) Dr. Marquardt diagnosed Plaintiff with

thyrotoxicosis, a condition affecting thyroid hormone levels, and ophthalmopathy, which presents with symptoms such as bulging eyes, pressure, pain in the eyes, or blurred vision. (*Id.*) Dr. Marquardt continued to treat Plaintiff throughout 2012 and also referred Plaintiff to an endocrinologist. (AR 397.)

On October 24, 2012, Plaintiff began treatment with endocrinologist Georges M. Argoud, M.D., ("Dr. Argoud") for thyroid issues. (AR 363–64.) Dr. Argoud recommended thyroid surgery or radioactive iodine therapy as Plaintiff's Graves' disease, exophthalmos, and goiter continued to worsen. (*Id.*) Dr. Argoud treated Plaintiff through the end of 2013. (AR 492–96.) On March 21, 2014, Dr. Argoud performed radioactive iodine therapy on Plaintiff. (AR 509, 554.)

On May 4, 2015, Plaintiff began treatment with internist and endocrinologist Margot J. Aiken, M.D., ("Dr. Aiken") for his hyperthyroidism. (AR 617, 1135.) Dr. Aiken also diagnosed Plaintiff with heart palpitations. (AR 1018.) During the course of treatment, Dr. Aiken noted numbness and tremors in Plaintiff's hands and arms. (AR 1020, 1080.) Dr. Aiken discussed options similar to those Dr. Argoud proposed, including radioactive iodine therapy and surgery. (AR 622, 1019.)

### 3.  Evaluation and Treatment by Dr. Sandler from 2015–2019

On May 22, 2015, Plaintiff began treatment with endocrinologist Jeffrey A. Sandler, M.D., ("Dr. Sandler") for his thyroid issues. (AR 632.) Contrary to previous diagnoses, Dr. Sandler suspected Plaintiff had Hashimoto's disease instead of Graves' disease. (*Id.*) Dr. Sandler discussed Plaintiff's treatment options, which were the same as previous recommendations: thyroidectomy and radioactive iodine therapy. (AR 1075.) Dr. Sandler prescribed new medication for Plaintiff with the aim of shrinking Plaintiff's thyroid gland. (AR 630.) Dr. Sandler continued to treat Plaintiff throughout 2015 and 2016 without significant changes in Plaintiff's thyroid condition. (AR 1033, 1071–72.)

In 2017, Dr. Sandler noted Plaintiff's Hashimoto's disease appeared to improve with medication as Plaintiff's thyroid gland was getting smaller. (AR 1038, 1070.) However, in 2018, Dr. Sandler noted Plaintiff's "Hashimoto's thyroiditis has become overactive." (AR

1124.) Dr. Sandler administered radioactive iodine therapy, but Plaintiff was still considered hyperthyroid, so Dr. Sandler prescribed Plaintiff a new course of medication. (AR 1123.) In 2019, Dr. Sandler noted Plaintiff was still hyperthyroid. (AR 1121.)

### c. Psychological Health Evaluation and Treatment

#### 1. Evaluation by Dr. Buono in 2011

On November 11, 2022, Plaintiff's first documented psychological medical issue was raised during an emergency department visit to UCSD Health. (*See* AR 317, 325.) Dr. Buono noted the doctors were unable to assess Plaintiff's psychological issues in Plaintiff's native language, but according to Plaintiff's sister, who accompanied Plaintiff on the visit, Plaintiff is "like a child sometime[s]." (*Id.*)

#### 2. Evaluation and Treatment by Drs. Marquardt, Carlton, and Karp from 2011–2014

On June 1, 2012, Dr. Marquardt referred Plaintiff to the psychiatry department for "worsening psychotic symptoms over the last few years, now with hearing voices and being angry and disruptive at times." (AR 396.) On June 2, 2012, Dr. Marquardt exchanged messages with psychiatric specialist Bella G. Montgomery, N.P., ("Montgomery") regarding Plaintiff's condition. (AR 475.) Dr. Marquardt requested psychiatric evaluation for concerns of paranoia and psychosis. (*Id.*) Montgomery indicated Plaintiff's mental health issues were unrelated to Plaintiff's thyroid condition and required root cause analysis. (AR 474.)

On June 29, 2012, Dr. Marquardt prescribed Seroquel to Plaintiff after diagnosing him with "bipolar disorder, curr[ent] episodes mixed, severe, with psychotic features." (AR 394.) On July 27, 2012, Dr. Marquardt noted Plaintiff's psychological problems persisted and that Plaintiff declined psychological medicines. (AR 391–92.) On the same day, in a claim for disability benefits with the California Employment Development Department, Dr. Marquardt noted Plaintiff was "incapable of performing his/her regular or customary work" on or before December 5, 2011, due to "severe mental health problems" and Plaintiff "failed numerous med[ications]." (AR 329.) On October 5, 2012, Dr. Marquardt affirmed

Plaintiff's continued psychological issues and noted Plaintiff needed to visit with a psychology department either at Dr. Marquardt's medical center or at the Union of Pan Asian Communities ("UPAC"). (AR 389.)

On November 14, 2012, psychiatrist Sharmila G. Carlton, M.D., ("Dr. Carlton") diagnosed Plaintiff with "other and unspecified reactive psychosis" and prescribed Latuda to Plaintiff for his bipolar depression. (AR 386.) On January 9, 2013, Dr. Carlton noted Plaintiff continued to suffer from reactive psychosis accompanied by paranoia about people running Plaintiff over, mania, hearing both male and female voices conversing with themselves, and disruptive, angry behaviors. (AR 437.) Dr. Carlton subsequently changed Plaintiff's medicine from Latuda to Abilify. (AR 438.)

On January 29, 2013, psychologist Andrea Karp, Psy.D. began treating Plaintiff. Dr. Karp noted Plaintiff's paranoia began in 2011 after Plaintiff was diagnosed with Crohn's disease and Plaintiff's father had a stroke. (AR 377.) During this visit, Dr. Karp diagnosed Plaintiff with psychosis and encouraged Plaintiff to go to UPAC for therapy. (AR 380.)

On October 25, 2013, Dr. Marquardt noted Plaintiff continued to suffer from bipolar disorder. (AR 435.) Throughout the end of 2013 and through January 22, 2014, Dr. Marquardt continued to treat Plaintiff for bipolar disorder and maintained Plaintiff's prescription for Abilify. (AR 415, 431–33.)

### 3.  Evaluation by Dr. Nicholson in 2014

On January 17, 2014, psychiatrist Gregory M. Nicholson, M.D., ("Dr. Nicholson") evaluated Plaintiff as a part of the SSA's procedures in evaluating Plaintiff's disability claims. (AR 410.) Dr. Nicholson confirmed Plaintiff was suffering from a severe "psychotic disorder and bipolar disorder[] based on symptoms related to both mania and depression." (*Id.*) Dr. Nicholson also performed a functional assessment of Plaintiff's condition, which indicated Plaintiff could likely work in a job and improve within 12 months with active treatment. (*Id.*)

/ / /

/ / /

### 4. Evaluation and Treatment by Drs. Henderson, Miller, and Grisolia in 2014

On April 15, 2014, psychiatrist Harry C. Henderson, M.D., ("Dr. Henderson") evaluated and began treating Plaintiff for Plaintiff's psychological concerns. (AR 417.) On July 24, 2014, Dr. Henderson diagnosed Plaintiff with severe major depression and identified Plaintiff's thyroid issues as the primary cause of the depression. (AR 418.) On July 24, 2014, Dr. Henderson requested psychological evaluation and treatment from psychologist Don E. Miller, Ph.D., ("Dr. Miller") to help with Plaintiff's depression. (*Id.*)

On August 4, 2014, Dr. Miller evaluated Plaintiff and confirmed Dr. Henderson's diagnosis of depression and diagnosed Plaintiff with anxiety, insomnia, and amnestic disorder. (AR 423.) Dr. Miller also noted Plaintiff continued to experience bipolar and psychotic disorders. (AR 421.)

On August 5, 2014, neurologist James S. Grisolia, M.D., ("Dr. Grisolia") began evaluating and treating Plaintiff. (AR 429.) Dr. Grisolia concurred with Dr. Henderson regarding Plaintiff's "disabling anxiety and insomnia" and "adjustment disorder with anxiety." (*Id.*) Dr. Grisolia deferred the determination of the root cause of Plaintiff's anxiety to Dr. Henderson, and noted Plaintiff is "receiving aggressive medication treatment" for Plaintiff's psychological issues. (*Id.*)

### 5. Evaluation and Treatment by Drs. Truong, Lessner, Aiken, Sandler, and Grisolia from 2015–2016

On March 18, 2015, internist Tu N. Truong, M.D., ("Dr. Truong") identified Plaintiff's chronic problems including bipolar disorder. (AR 1149–50.)

On April 2, 2015, psychologist Milton H. Lessner, Ph.D., ("Dr. Lessner") evaluated Plaintiff and found compelling evidence of depression and a "distorted, bizarre, inept and disoriented thought process." (AR 484.) Dr. Lessner's formal diagnosis was of major depression with psychotic features, generalized anxiety disorder, and schizoid personality disorder. (AR 488–89.)

On May 4, 2015, internist and endocrinologist Margot J. Aiken, M.D., ("Dr. Aiken")

began treating Plaintiff due to changes in Plaintiff's insurance. (AR 617.) Dr. Aiken noted Plaintiff's history of anxiety and bipolar disorder. (AR 1135.) On May 22, 2015, Dr. Aiken noted Plaintiff's anxiety was due in part to Plaintiff's thyroid issues. (AR 1021.) On August 26, 2015, Dr. Aiken noted Plaintiff was experiencing auditory hallucinations. (AR 1034.)

On May 26, 2015, Dr. Sandler also noted Plaintiff was experiencing anxiety. (AR 1132.)

On November 24, 2015, Dr. Grisolia diagnosed Plaintiff with schizoid personality disorder, confirming Dr. Lessner's previous diagnosis. (AR 490.)

### 6. Evaluation and Treatment by Dr. Henderson from 2015–2017

On December 22, 2015, Dr. Henderson noted Plaintiff was experiencing visual and auditory hallucinations, delusion, paranoia, and severe "panic episodes." (AR 663–64.) On March 17, 2016, Dr. Henderson noted Plaintiff's continued severe delusions. (AR 690.) During the March 17, 2016, evaluation, Dr. Henderson also diagnosed "[r]ule out schizophrenia[,] . . . [r]ule out post-traumatic stress disorder[,] . . . and [r]ule out atypical psychosis." (AR 691.) Dr. Henderson noted Plaintiff experienced psychosocial stressors including poor acculturation, stress from exposure to continuous and severe tremors, and dependency on Plaintiff's mother. (*Id.*)

On August 27, 2017, Dr. Henderson reported to ALJ Levine that Plaintiff was severely delusional in believing he could care for his ill father. (AR 1173.) Dr. Henderson also noted Plaintiff experienced bouts of despair, hallucination, delusion, depression, and anxiety. (AR 1170.) Dr. Henderson added Plaintiff is "not able to compete in the workplace and is in need of continued therapy . . . and continued use of antidepressant and antipsychotic medication." (AR 1172.)

### 7. Evaluation by Dr. Kim in 2017

On October 4, 2017, psychiatrist Michael B. Kim, D.O., ("Dr. Kim") evaluated Plaintiff as a part of the SSA's procedures in evaluating Plaintiff's disability claims. (AR 1089–92.) Dr. Kim noted Plaintiff heard voices and was unable to focus and easily confused. (AR 1089, 1091.) Plaintiff reported to Dr. Kim that Plaintiff was not taking

medications at that time. (*Id.*) Dr. Kim performed a mental status exam which showed Plaintiff's appearance, speech, mood, affect, thought process, and thought content within the normal range. (AR 1090.) Dr. Kim's evaluation showed Plaintiff's memory was within the normal limits, but Plaintiff had deficits in concentration, fund of information, insight, and judgment. (AR 1091.) Dr. Kim diagnosed Plaintiff with "psychotic disorder, not otherwise specified." (*Id.*)

Dr. Kim found Plaintiff could follow simple instructions with a mild limitation in following detailed instructions. (AR 1092.) Dr. Kim noted Plaintiff had mild limitations in interacting with others, complying with job rules, responding to changes in a routine work setting, and responding to work pressure in a usual work setting, and no limitation on daily activities. (*Id.*)

### 8. Evaluation and Treatment by Dr. Zappone from 2018–2019

On April 9, 2018, UPAC psychiatrist Ronald A. Zappone, M.D., ("Dr. Zappone") began treating Plaintiff. (AR 1108.) Dr. Zappone diagnosed Plaintiff with unspecified psychosis not due to a substance (*id.*) and Dr. Henderson's previous prescriptions of Zoloft and Ziprasidone to Plaintiff. (AR 1102). Plaintiff had not been on either of the two medications for many months since he last saw Dr. Henderson in 2017. (*See id.*)

On June 22, 2018, Dr. Zappone conducted a therapeutic session with Plaintiff. (AR 1111.) Dr. Zappone noted Plaintiff's persistent hallucinations and anxiety, and prescribed Zoloft and Ziprasidone to manage Plaintiff's symptoms. (AR 1111–12.)

Dr. Zappone continued to treat Plaintiff throughout 2018 and 2019 and noted that the medications were effective in controlling the psychotic symptoms, that Plaintiff was compliant with taking the medications, and the medications did not have any adverse side effects. (AR 1111–20.)

### d. ALJ Levine's September 9, 2020, Decision

On September 9, 2020, ALJ Levine issued a Notice of Decision, denying Plaintiff's benefits claims after finding Plaintiff was not disabled within the meanings of sections 216(i), 223(d), and 1614(a)(3)(A) of the Act to qualify for disability insurance or SSI

benefits. (AR 710.) ALJ Levine based his conclusion on 11 findings of fact:

(1) **Plaintiff met the insured status requirement of the Act through September 30, 2016** (AR 699);

(2) **Plaintiff had not engaged in substantial gainful activity since June 1, 2011, the alleged onset date**, citing to 20 C.F.R. 404.1571, *et seq.*, and 416.971 *et seq.* (*Id.*);

(3) **Plaintiff had the following severe impairments: Hashimoto's thyroiditis; psychotic disorder; and major depressive disorder**, citing to 20 C.F.R. 404.1520(c) and 416.920(c). (*Id.*) ALJ Levine explained the above impairments significantly limited Plaintiff's ability to perform basic work activities. (*Id.*) ALJ Levine noted Plaintiff's additional claims of double vision, retinal detachment, and impaired visual acuity leading to severe visual impairment were not supported by the record. (*Id.*) ALJ Levine also noted Plaintiff's additional claim of post-traumatic stress disorder was not supported by evidence to be a medically determinable impairment (*Id.*);

(4) **Plaintiff did not have an impairment or combination of impairments that met or medically equaled to the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1**, citing to 20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926. (*Id.*) ALJ Levine stated Plaintiff's mental impairments do not include one extreme limitation[2] or at least two marked limitations[3] in a broad area of functioning, which was required to meet the criteria in listings 12.03 and 12.04 in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) ALJ Levine noted Plaintiff's mental impairments included mild and moderate limitations,

---

[2] An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.03, 12.04.
[3] A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis. *Id.*

but none of the impairments rose to the extreme or marked limitation levels (AR 700);

(5) **Plaintiff had the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. 404.1567(c) and 416.967(c) except for the following: no work at unprotected heights or being around dangerous, moving machinery; simple and repetitive tasks (routine, non-complex tasks); and no work with the public.** (*Id.*) ALJ Levine considered all symptoms, the extent to which these symptoms could reasonably be accepted as consistent with objective medical evidence, and opinion evidence based on the requirements of 20 C.F.R. 404.1529, 416.929, 404.1527, and 416.927. (AR 701.) ALJ Levine noted the "intensity, persistence and limiting effects of [Plaintiff's] symptoms are not entirely consistent with the medical evidence and other evidence in the record," which led ALJ Levine to determine the symptoms were not as limiting as Plaintiff alleged (*Id.*);

(6) **Plaintiff was unable to perform any of his past relevant work**, citing to 20 C.F.R. 404.1565 and 416.965. (AR 708.) ALJ Levine noted Plaintiff's mental limitations precluded Plaintiff's ability to perform past relevant work as actually or generally performed (*Id.*);

(7) **Plaintiff was 39 years old and born on May 10, 1972, and thus qualified as a younger individual age 18–49, on the alleged disability onset date**, citing to 20 C.F.R. 404.1563 and 416.963 (*Id.*);

(8) **Plaintiff had a marginal education and was unable to communicate in English**, citing to 20 C.F.R. 404.1564 and 416.964. (*Id.*) ALJ Levine noted Plaintiff had five years of formal education in Vietnam. (*Id.*) ALJ Levine also noted conflicting testimony from Plaintiff and Plaintiff's mother regarding Plaintiff's English communication abilities. Even so, ALJ Levine gave Plaintiff the "benefit of the doubt" in finding Plaintiff unable to communicate in English (AR 708–09);

(9) **Transferability of job skills was immaterial to the determination of disability because the Medical-Vocational Rules supported a finding that the claimant**

was "not disabled," whether or not the claimant had transferrable job skills, citing to S.S.R. 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2 (AR 709);

(10) **In considering Plaintiff's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform**, citing to 20 C.F.R. 404.1569, 404.1569(a), and 416.969(a). (*Id.*) In so finding, ALJ Levine cited to the vocational expert's testimony from his earlier decision on April 1, 2016 and explained Plaintiff's current RFC capacity was "precisely the same" as before. (*Id.*) That vocational expert testified Plaintiff could perform the requirements of occupations such as a laundry worker, a sweeper cleaner, and a floor waxer. (*Id.*) Based on that testimony, ALJ Levine noted Plaintiff "[wa]s capable of making a successful adjustment to other work that exist[ed] in significant numbers in the national economy." (AR 710.) ALJ Levine concluded a finding of "not disabled" was therefore appropriate (*Id.*); and

(11) **Plaintiff had not been under a disability, as defined in the Act, from June 1, 2011, through the date of ALJ Levine's September 9, 2020 decision**, citing to 20 C.F.R. 404.1520(g) and 416.920(g). (*Id.*)

## III.   <u>LEGAL STANDARD</u>

The Act provides for federal district court review of a final agency decision denying a claim for social security disability benefits. 42 U.S.C. § 405(g). The Court's review of social security determinations is limited, and the Court will uphold the Commissioner's determination unless the Commissioner made a legal error or the determination is not supported by "substantial evidence." *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014); *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014). Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012) (citing *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)).

In evaluating whether the ALJ's determination is supported by substantial evidence, the Court must consider "the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Garrison*, 759 F.3d at 1009 (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)). It is the ALJ's responsibility to make credibility determinations and resolve ambiguities and conflicts in the medical testimony. *Id.* at 1010 (citing *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir.1995)). "[W]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (citing *Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999)). To that end, it is not the Court's job to interpret or re-evaluate the evidence, even if doing so would result in a favorable outcome for the plaintiff. *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004).

## IV.    **DISCUSSION**

In the Joint Motion, the Parties identified four issues for the Court's review, namely whether ALJ Levine:

(1) properly rejected the opinions of Dr. Marquart and Dr. Aiken;

(2) properly rejected the opinions of Dr. Henderson, Dr. Miller, and Dr. Lessner;

(3) properly rejected the opinion of Dr. Grisolia and Dr. Zappone;[4] and

(4) made clear the basis for his credibility determinations.

The Court addresses each issue in turn.

/ / /

/ / /

/ / /

/ / /

---

[4] The Joint Motion referred to Dr. Aiken and Dr. Henderson across multiple issues. To avoid confusion, the Court has realigned the issues so that each doctor is only considered once in the analysis.

### a.  ALJ Levine Did Not Properly Reject Drs. Marquardt and Aiken's Opinions.

Section 404.1527 of Title 20 of the Code of Federal Regulations[5] requires an ALJ to apply the "treating source" rule, under which more weight is afforded to a treating physician's medical opinions.[6] *See Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017). Under this rule, an ALJ may reject a treating or examining physician's contradicted medical opinion only for specific and legitimate reasons supported by substantial evidence in the record. *See id.*; *see also Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014).

An ALJ can satisfy the substantial evidence burden for rejecting a treating physician's contradicted opinion by detailing a thorough summary of the facts and conflicting evidence and setting forth the ALJ's interpretation of the facts and evidence in support of the ALJ's ultimate conclusions. *Garrison*, 759 F.3d at 1012 (9th Cir. 2014) (citing *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). In doing so, the ALJ must provide more than conclusory statements to explain his rationale. Specifically, the ALJ must explain why his interpretations are correct rather than the physician's opinion. *Id.* An ALJ errs when he or she does not explicitly reject a medical opinion or does not detail specific and legitimate reasons for valuing one medical opinion over another. *Garrison*, 759 F.3d at 1012 (citing *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996).

Here, ALJ Levine failed to detail a thorough summary of the facts and conflicting evidence regarding Drs. Marquardt and Aiken's medical opinions. ALJ Levine referenced

---

[5] In 2017, the Commissioner issued new regulations regarding ALJ evaluations of medical opinions that apply to claims filed on or after March 17, 2017. 20 C.F.R. § 404.1520c. Plaintiff's original claims were filed before March 17, 2017, and Plaintiff's subsequent claim filed on July 31, 2017, was considered a duplicate and consolidated by the SSA Appeals Council; therefore, the regulations in place for claims filed before March 27, 2017, will apply. *See* 20 C.F.R. § 404.1527.

[6] Medical opinions are "statements from acceptable medical sources that reflect judgments about the nature and severity of [a patient's] impairment(s), including [their] symptoms, diagnosis and prognosis, what [they] can still do despite impairment(s), and [their] physical or mental restrictions." 20 C.F.R. 404.1527(a)(1).

Dr. Marquardt just three times in his Notice of Decision. (AR 702, 708.) In his first reference to Dr. Marquardt, ALJ Levine used Dr. Marquardt's medical opinion to contradict other medical evidence regarding Plaintiff's psychiatric treatment history. (AR 702.) ALJ Levine referred to Dr. Marquardt for a second and third time to simply address Plaintiff's English language abilities. (AR 702, 708.) ALJ Levine did not reference Dr. Aiken in the report to any extent.

While implicitly referring to Drs. Marquardt and Aiken's medical opinions by citing to Exhibits 9F, 11F, 16F, 19F, 21F, 23F, 25F, 29F, 30F, 32F, 33F, and 37F (AR 700–08), ALJ Levine failed to articulate the exhibits' significance and ultimately tie it to his assessment of Drs. Marquardt and Aiken's credibility. In stark contrast, ALJ Levine provided thorough summaries of Plaintiff's evaluation and treatment with other physicians, including Drs. Lessner and Henderson's. (AR 704–06). ALJ Levine failed to offer a comparable level of detail to Drs. Marquardt and Aiken's evaluation and treatment of Plaintiff.

ALJ Levine separately erred when he did not explicitly reject Drs. Marquardt and Aiken's medical opinions. Although he compared Drs. Marquardt and Aiken's treatment notes to exhibits, at no point did ALJ Levine assign any level of weight or even outright reject either of the physicians' medical opinions. ALJ Levine explained the weight he provided to other examiners and treating physicians, including Drs. Nicholson (AR 705) and Henderson (AR 706), but failed to apply the same treatment towards Drs. Marquardt and Aiken.

Lastly, ALJ Levine did not detail specific and legitimate reasons for valuing other medial opinions over Drs. Marquart and Aiken's medical opinions. On remand, ALJ Levine was instructed to detail his reasoning when evaluating treating physician medical opinions in accordance with regulatory factors including the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, supportability, and consistency with the record. (*See* AR 785, citing 20 C.F.R. § 404.1527(c)(2-6).) ALJ Levine wholly failed to remedy this error as to Dr. Marquardt

20-CV-2391-WVG

and Dr. Aiken's medical opinions.

Defendant argues a doctor's treatment notes are not considered a medical opinion under the Act. Not so. A treating physician's treatment records, including reports, medical test results, and treatment notes, are necessary components of an ALJ's evaluation of a disability claim. *See Garrison* 759 F.3d at 1014 (holding ALJ erred in rejecting the treating physician's testimony when ALJ disregarded the doctor's treatment notes and failed to compare the doctor's records to a contradictory source). While Defendant accurately states the legal standard regarding the quality of a treating physician's testimony in making a residual functional capacity ("RFC") determination,[7] Defendant failed to provide any legal standard that would justify the exclusion of treatment notes and other medical documents under the umbrella of a medical record. Here, ALJ Levine should have expressly evaluated Drs. Marquardt and Aiken's treatment notes and other medical records and compared them to contradictory evidence to sufficiently reject or devalue their opinions. Therefore, the Court finds that, as to Drs. Marquardt and Aiken, ALJ Levine did not meet the specific and legitimate standard. To properly reject the opinions of Drs. Marquardt and Aiken, ALJ Levine must provide a detailed summary of Drs. Marquardt and Aiken's evaluation and treatment of Plaintiff and specifically explain why their medical opinions were rejected.

**b. ALJ Levine Properly Rejected the Opinions of Drs. Henderson, Miller, and Lessner.**

The treating source rule and the specific and legitimate standard analyzed above also apply to the instant issue, namely whether ALJ Levine properly rejected Drs. Henderson, Miller, and Lessner's opinion. *See Trevizo*, 871 F.3d at 675. The Court answers affirmatively and finds ALJ Levine extensively considered the record for each of these

---

[7] "Vague statements or descriptions of ability to perform in a workplace are not useful in determining an RFC because they fail to specify functional limits. *Ford v. Saul*, 950 F.3d 1141, 1156 (9th Cir. 2020); *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999)." Joint Mot. Judicial Review 23:14–28, ECF No. 28.

three doctors. Accordingly, the Court finds substantial evidence supports ALJ Levine's determination regarding the weight assigned to each doctor's medical opinion and elaborates below.

### 1. ALJ Levine Provided Specific and Legitimate Reasons to Discount Dr. Henderson's Medical Opinion.

ALJ Levine provided a detailed account of Dr. Henderson's evaluations and testing of Plaintiff. (AR 705–06.) In doing so, ALJ Levine assigned "very little weight" to Dr. Henderson's opinion because there were inconsistencies between Dr. Henderson's conclusions regarding Plaintiff's mental health and records and other physicians' medical opinions. (AR 706.) ALJ Levine compared Dr. Henderson's assessment of Plaintiff's memory to multiple conflicting records including from Drs. Nicholson and Miller. (*Id.*) ALJ Levine also compared Dr. Henderson's opinion directly to the opinions of Drs. Nicholson and Kim. (*Id.*) Regarding Plaintiff's functional ability, ALJ Levine identified inconsistencies between Dr. Henderson's opinion and Dr. Lessner's opinion. (*Id.*) ALJ Levine also noted the discrepancy between Dr. Henderson's assessment of Plaintiff and the progress notes from Dr. Grisolia which indicated improvement of Plaintiff's psychotic condition. (*Id.*) Lastly, ALJ Levine questioned the credibility of Dr. Henderson's opinions due to Dr. Henderson's surrender of his medical license after accusations of inappropriate medication prescriptions, failure to maintain accurate records, and gross negligence raised by the California State Medical Board. (*Id.*)

At all times, the incongruity between a doctor's opinion and their patient's objective medical records provides an additional specific and legitimate reason for rejecting or discounting a medical opinion. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); *see also Matney ex rel Matney v. Sullivan*, 981 F.2d 1016, 1020 (9th Cir. 1992). In light of the circumstances here, the Court concludes ALJ Levine properly considered Dr. Henderson's opinion and appropriately discounted Dr. Henderson's opinion for specific and legitimate reasons supported by substantial evidence in the record.

/ / /

### 2. ALJ Levine Provided Specific and Legitimate Reasons to Discount Dr. Miller's Medical Opinion.

ALJ Levine assigned "very little weight" to Dr. Miller's opinion as it heavily relied on Dr. Henderson's opinion, was inconsistent with internal objective findings, and was inconsistent with the longitudinal medical record. (AR 707.) As Dr. Henderson's opinion was discounted for specific and legitimate reasons, ALJ Levine's discount of Dr. Miller's medical opinion was justified due to Dr. Miller's reliance on Dr. Henderson's records. (*See id.*) ALJ Levine also noted the inconsistency between Dr. Miller's opinion regarding Plaintiff's short-term memory problems and the average results of Dr. Miller's objective test of Plaintiff's short-term memory. (*Id.*) Further, ALJ Levine noted the inconsistencies between Dr. Miller's opinion and direct observations regarding Plaintiff's ability to read. For example, ALJ Levine noted that Dr. Miller's opinion relied upon Dr. Henderson's opinion that Plaintiff could not see well enough to work, drive, or even read. (*Id.*) However, Dr. Miller's direct observation noted Plaintiff could read his phone and the clock on the wall and write during Dr. Miller's examination. (*Id.*) This was only one of the several instances ALJ Levine specifically provided as the basis to discount Dr. Miller's medical opinion. (*Id.*)

While ALJ Levine did not explicitly compare Dr. Miller's medical opinion to other medical opinions, he assigned varying weights to medical opinions demonstrating a comparison did occur. Accordingly, the Court concludes ALJ Levine properly considered Dr. Miller's opinion and appropriately discounted the weight of Dr. Miller's medical opinion for specific and legitimate reasons supported by substantial evidence in the record.

### 3. ALJ Levine Provided Specific and Legitimate Reasons to Discount Dr. Lessner's Medical Opinion.

ALJ Levine provided a detailed account of Dr. Lessner's evaluations and testing of Plaintiff. (AR 704–05.) In doing so, ALJ Levine assigned Dr. Lessner's opinion "very little weight" due to internal inconsistencies in Dr. Lessner's records, Dr. Lessner's reliance on Dr. Henderson's medical opinion, and Dr. Lessner's medical opinion's inconsistency with

20-CV-2391-WVG

Dr. Kim's medical opinion. (*Id.*)

With respect to inconsistencies in Dr. Lessner's records, ALJ Levine identified several specific and legitimate instances of contradiction, including observation notes describing Plaintiff's affect as "repressed, asocial, withdrawn, sullen, [and] possibly high strung" and "essentially cooperative and pleasant" at the same time. (AR 704.) ALJ Levine also referred to the incongruity between Dr. Lessner's diagnosis of Plaintiff as having a severely restrictive functional capacity while also noting that Plaintiff devotes most of his days caring for Plaintiff's disabled parents. (*Id.*) ALJ Levine noted Dr. Lessner's portrayal of Plaintiff as "totally psychotic, unable to function, is schizophrenic, detached from reality, cannot be around other people, cannot make decisions, is so restless and agitated that it is difficult for him to remain still" directly conflicted with another of Dr. Lessner's observation that Plaintiff "is low in energy, feels exhausted and is fatigued" and Plaintiff's mother's testimony that Plaintiff routinely leaves the house to walk for 4 or 5 hours at a time both in the day and night. (AR 705.)

ALJ Levine also provided specific and legitimate reasons for discounting Dr. Lessner's medical opinion based upon Dr. Lessner's reliance on Dr. Henderson's medical opinion. (AR 704-705.) ALJ Levine referenced the fact that Dr. Lessner stated Dr. Henderson was treating Plaintiff "for an obvious psychotic condition" when Dr. Henderson's diagnosis of Plaintiff was instead of major depression. (AR 704.) ALJ Levine also noted the issue with Dr. Lessner's reliance on Plaintiff's examining physicians' opinions that Plaintiff was unable to tolerate employment, since Dr. Henderson was the only physician who rendered such an opinion. (*Id.*)

Finally, ALJ Levine noted a contrast between Dr. Lessner's medical opinion and Dr. Kim's opinion regarding mental health. (AR 705.) Dr. Lessner opined Plaintiff's thought process was largely distorted, bizarre, inept, and disorganized yet Dr. Kim noted Plaintiff's self-report denied paranoia, thought broadcasting or insertion, phobias, obsessions, derealization's and depersonalizations, and Plaintiff's evaluation showed no evidence of looseness of association or thought organization. (*Id.*)

1    Therefore, the Court concludes ALJ Levine properly considered Dr. Lessner's

2    opinion and appropriately gave a discounted weight to Dr. Lessner's medical opinion for

3    specific and legitimate reasons supported by substantial evidence in the record.

4        **c.  ALJ Levine Did Not Properly Reject the Opinions of Drs. Grisolia and**

5        **Zappone.**

6        ALJ Levine's findings regarding Drs. Grisolia and Zappone's medical opinions are

7    also subject to the treating source rule and the specific and legitimate standard. *See Trevizo*,

8    871 F.3d at 675. To properly reject the opinions of Drs. Grisolia and Zappone, ALJ Levine

9    was required to provide a detailed summary of Drs. Grisolia and Zappone's evaluation and

10   treatment of Plaintiff and specifically explain why each of these medical opinions were

11   rejected.

12       Here, ALJ Levine failed to detail a thorough summary of the facts and conflicting

13   evidence regarding Drs. Grisolia and Zappone's medical opinions. (AR 696-710.) ALJ

14   Levine's decision explicitly referenced Dr. Grisolia a total of two times. (AR 699.) Both

15   references to Dr. Grisolia merely repeated portions of Dr. Grisolia's evaluation of

16   Plaintiff's eyesight and retinal issues. (*See id.*) Neither reference to Dr. Grisolia was related

17   to Plaintiff's mental health. (*See id.*) Although ALJ Levine referenced Dr. Grisolia's

18   medical opinions through references to Exhibits 15F, 18F, and 24F (AR 699–708), at no

19   point in ALJ Levine's decision did he state whether the referenced exhibits and treatment

20   notes had any connection to Dr. Grisolia's ultimate medical opinions. (AR 696-710.)

21   Furthermore, ALJ Levine's decision failed to state whether Dr. Grisolia's medical opinions

22   were rejected or assigned any weight of importance. (AR 696-710.) Instead, Dr. Grisolia's

23   treatment notes related to visual acuity were simply listed in comparison to other

24   conflicting treatment notes. (*Id.*) No explanation whatsoever was provided as to the value

25   or weight of this conflicting medical evidence. (*Id.*)

26       ALJ Levine's failure to detail a thorough analysis of his rejection of Dr. Zappone's

27   medical opinion is even more evident. ALJ Levine never explicitly referenced Dr. Zappone

28   in his decision nor did he reference any exhibits related to Dr. Zappone's treatment of

Plaintiff. (AR 696-710.) ALJ Levine also failed to state whether he explicitly rejected or assigned any weight to Dr. Zappone's medical opinions.

Lastly, ALJ Levine did not detail specific and legitimate reasons for valuing other medial opinions over Drs. Grisolia and Zappone's medical opinions. While the August 3, 2018 Report and Recommendation did not include specific instructions regarding Drs. Grisolia and Zappone's[8] medical opinions, ALJ Levine should have inferred from the August 3, 2018 Report and Recommendation that a more rigorous treatment of each physician's medical opinion was necessary to satisfy the specific and legitimate standard. (*See* AR 785.) Just as ALJ Levine did not remedy this error regarding Dr. Marquardt's medical opinion, ALJ Levine did not meet the standard regarding Drs. Grisolia and Zappone.

Therefore, the Court finds ALJ Levine did not meet the specific and legitimate standard to properly reject Drs. Grisolia and Zappone's medical opinions.

### d. ALJ Levine Did Not Make Clear the Basis for the Credibility Determinations Regarding Plaintiff and Plaintiff's Mother.

When determining a claimant's residual functioning capacity, the ALJ must consider all relevant evidence in the record, including lay evidence. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (citing SSR 96-8p, 1996 WL 374184, at 5). When the claimant makes statements about their symptoms and their functional effect, the ALJ must make a finding as to the credibility of the claimant's statements. *Id.* (citing SSR 96-7p, 1996 WL 374186, at 1). If the ALJ's credibility determination is supported by substantial evidence, the Court will defer to the ALJ's determination. *Thomas*, 278 F.3d at 959. When making a credibility determination regarding a claimant's subjective testimony, the ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*

---

[8] Dr. Zappone did not begin treating Plaintiff until April 9, 2018, so the court did not consider Dr. Zappone's medical opinion during the first appeal of the ALJ's decision. (*See* AR 792, 1102.)

*v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996). The ALJ may reject a claimant's testimony regarding the severity of symptoms by offering "specific, clear, and convincing" reasons for doing so. *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (quoting *Lingenfelter*, 504 F.3d at 1036). "An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability." 42 U.S.C.A. § 423(d)(5)(A). There must be some clinical or diagnostic evidence "which show[s] the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities" that reasonably could be expected to produce the alleged pain or other symptoms. *Id.* "[I]n evaluating a claimant's subjective complaints of pain [or other symptoms], the adjudicator must give full consideration to all of the available evidence, medical *and other,* that reflects on the impairment and any attendant limitations of function." *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996) (quoting SSR 88–13, emphasis added). Such other evidence includes the claimant's prior work record, her daily activities, and observations by treating and examining physicians and third parties about the claimant's symptoms and their effects. *Id.*

The ALJ may use "ordinary techniques of credibility evaluation" when evaluating the claimant's testimony. *Id.* (quoting *Turner v. Comm'r Soc. Sec.*, 613 F.3d 1217, n. 3). These techniques may include considering inconsistent statements, scrutinizing poorly explained failures to seek treatment or complete prescribed treatment, and evaluating the claimant's daily activity. *See id.* Within the scope of the evidence considered by ALJ Levine, ALJ Levine met the specific, clear, and convincing standard regarding Plaintiff's credibility. ALJ Levine identified inconsistencies between Plaintiff's testimony and objective medical evidence. (AR 701–03.) ALJ Levine considered the intensity of Plaintiff's treatment regimen in comparison to Plaintiff's testimony. (AR 702.) ALJ Levine also identified inconsistencies between the activities Plaintiff claimed to perform and the symptoms Plaintiff alleged. (AR 702–03.)

When assessing the credibility of a third party, the ALJ may reject a third party's testimony if the ALJ provides justification germane to that third party. *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007). Within the scope of the evidence considered by ALJ Levine,

ALJ Levine did not err in his assessment of the testimony of Hoa T. Nguyen, Plaintiff's mother. ALJ Levine identified multiple points of conflict between Plaintiff's mother's testimony, Plaintiff's testimony, and the record. In particular, ALJ Levine highlighted contradictory statements about Plaintiff's ability to maintain friendships, activity levels, and responsibilities in the home. (*See* AR 702–03, 708.) Each contradiction identified by ALJ Levine is germane to the relationship between Plaintiff and his mother as they live together, and Plaintiff's mother's testimony reflects direct observations from that relationship.

However, because ALJ Levine did not properly evaluate and consider the medical opinions of all relevant treating physicians, Drs. Marquardt, Aiken, Grisola, and Zappone, it is not clear whether ALJ Levine gave "full consideration to all of the available evidence". *Smolen*, 80 F.3d at 1285. Thus, ALJ Levine's ultimate credibility determinations of Plaintiff and Plaintiff's mother are inadequate. The Court finds ALJ Levine did not adequately evaluate the credibility of Plaintiff and Plaintiff's mother. On remand, the ALJ should reevaluate Plaintiff and Plaintiff's mother's credibility in light of the "all available evidence". This includes the medical opinions of Drs. Marquardt, Aiken, Grisola, and Zappone, unless the ALJ can articulate specific and legitimate reasons supported by substantial evidence in the record for rejecting the medical opinions of a treating doctor. The ALJ should make clear such credibility determinations considered "all available evidence" which is "supported by substantial evidence" in the record. *Smolen*, 80 F.3d at 1285.

## V.    **CONCLUSION**

The Court finds the ALJ improperly rejected the medical opinions of Drs. Marquardt, Aiken, Grisola, and Zappone and did not properly evaluate the credibility of Plaintiff and Plaintiff's mother's testimony. Accordingly, the Court GRANTS IN PART and DENIES IN PART the Joint Motion for Judicial Review. This case is REMANDED for further proceedings consistent with this order.

On remand, the ALJ should provide due consideration to opinions of treating and

examining physicians in light of "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, and consistency with the record." *Revels*, 874 F.3d at 654 (citing 20 CFR § 404.1527(c)(2)-(6)). If the ALJ rejects these opinions, he must provide "specific and legitimate" reasons for doing so. Likewise, the ALJ must reevaluate credibility determinations in light of all available evidence.

**IT IS SO ORDERED.**

Dated: February 23, 2023

_____
Hon. William V. Gallo
United States Magistrate Judge